**Julianna McKENNA and Alice Brown, individually and on behalf of all others similarly situated, Plaintiffs-Appellants,**

v.

**PEEKSKILL HOUSING AUTHORITY, M. George Habeeb, individually and in his capacity as a consultant to the Peekskill Housing Authority, Cyrus A. Bleakley, individually and in his capacity as Chairman of the Members of the Authority, and John E. Daly, individually and in his capacity as Housing Manager of the Authority, Defendants-Appellees.**

No. 726, Docket 80-7846.

United States Court of Appeals, Second Circuit.

Argued Feb. 6, 1981.
Decided April 22, 1981.

---

Andrew L. Levy, White Plains, N. Y. (Judith A. Kaufman, Westchester Legal Services, Inc., White Plains, N. Y., John T. Hand, Croton-on-Hudson, N. Y., of counsel), for plaintiffs-appellants.

Peter B. Nickles, Peekskill, N. Y., for defendants-appellees.

Before LUMBARD, MANSFIELD and KEARSE, Circuit Judges.

MANSFIELD, Circuit Judge:

Plaintiffs-appellants Julianna McKenna and Alice Brown, tenants in a housing project operated by the Peekskill Housing Authority ("Authority"), appeal from a judgment of the Southern District of New York entered by Judge Charles H. Tenney on September 22, 1980, dismissing their action under 42 U.S.C. § 1983 challenging the constitutionality of the Authority's Rule 5, which required tenants to register and obtain prior permission for overnight visitors. Plaintiffs claimed that the rule infringed on their constitutional rights of association and privacy. They sought declaratory and injunctive relief as well as $25,000 in damages apiece. On their motion for summary judgment, the district court instead granted judgment to the non-moving defendants. *McKenna v. Peekskill Housing Authority,* 497 F.Supp. 1217 (S.D.N.Y.1980). We affirm on grounds of mootness the dismissal of the claims for declaratory and injunctive relief. The dismissal of the damage claim is reversed and remanded for further proceedings.

At the time of commencement of this action, the Authority's Rule 5 provided:

### "5. ROOMERS, BOARDERS, LODGERS OR VISITORS.

"No person is permitted to occupy the premises except those duly registered in the Management Office and those listed on the dwelling application.

"At times you may desire overnight or weekend visits of friends or relatives. This matter should be discussed with the Management. No reasonable requests will be refused; however, you must register your visitor in the Management Office Register and show therein time of his or her arrival and departure. Overnight guests who cannot be reported to the office because of emergency or laté arriv-

al must be reported the next business day. Failure to comply with the above may subject the tenant to eviction proceedings."

The Rule was applied by the Authority to require tenants, including plaintiffs, in its Peekskill public housing project to identify in advance through written registration, which became part of the Authority's files, each person whom the tenant might wish to have as an overnight guest and to obtain Authority approval before having the guest visit or face the risk of termination of the tenant's lease for a violation. Plaintiffs claimed that the Rule impinged on their basic right to invite whomever they wished to their homes and thus operated as a prior restraint, violating their right of privacy and the First Amendment protection extended to rights of association, chilling their exercise of these rights, and causing them anxiety, fear, embarrassment and emotional suffering. In addition plaintiff McKenna claimed personal injury resulting from her inability, because of the Rule, to have her daughter stay as an overnight visitor and care for her and her children during a post-hospital convalescence.

The district court, although recognizing that the plaintiffs' right to freedom of association was protected by the First Amendment and that Rule 5 infringed this right, held that the exercise of the right here must give way to the state's compelling interest in "maintaining safe, decent housing and in keeping track of occupancy and eligibility in public housing." 497 F.Supp. at 1220. In addition, the district court pointed to the Authority's duties of equalizing the rentals paid by tenants and of preventing overcrowding, excessive use of water or electricity and disproportionate wear and tear. The same basic balancing approach was applied to reject the plaintiffs' privacy claims.

From this decision plaintiffs appealed.

## DISCUSSION

Since the district court's decision events have occurred which have mooted the plaintiffs' claims for injunctive and declaratory relief. On December 18, 1980, three days after plaintiffs filed their brief on this appeal, the Authority adopted a resolution which rescinded the challenged old Rule 5, voted to expunge from plaintiffs' files all references to violations of the Rule and resolved not to commence eviction proceedings against any tenant for violations of the Rule. In place of the Rule, the Authority substituted the language of the federal guidelines. The new Rule requires no prior discussions with or disclosures to the Authority, nor any registrations. The resolution provides that this step was taken because the Authority felt "that [it is] in the best interest of its tenants and the Peekskill Housing Authority to conform to Federal Regulations relative to Occupancy of the Dwelling Unit, and; WHEREAS, the State of New York Projects NY 47 and 97 will be transferred to and become Federal Projects in the near future." The resolution revised Rule 5 to read, "The tenant shall have the right to exclusive use and occupancy of the leased premises which shall include reasonable accommodation of the tenants' guests or visitors ...," which is the same as the language used in federal guidelines, see 24 C.F.R. § 866.4. Under the circumstances, including the fact that the Authority's rescission of old Rule 5 post-dated its obtaining a favorable result in the district court and the concession by the Authority's counsel upon argument that the old rule was "ludicrous," there appears to be no likelihood of a return to the old rule. To the extent that appellants seek declaratory and injunctive relief, therefore, their claims have become moot.

There remains the question of whether plaintiffs' claims of $15,000 damages from defendant Habeeb and $10,000 from the Authority are rendered "so insubstantial or so clearly foreclosed by prior proceedings" that the case may not proceed. See *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 8–9, 98 S.Ct. 1554, 1559, 1560, 56 L.Ed.2d 30 (1978) (permitting damage claim to proceed). Faced with a similar situation in *Davis v. Village Park II Realty Co.*, 578 F.2d 461 (2d Cir. 1978), where a

federal housing tenant's claim for injunctive relief based on threatened eviction because of exercise of her First Amendment rights was mooted by the defendants' agreement to drop the eviction proceeding, we nevertheless held that the plaintiffs' damage claim was "sufficient to ensure that the requisite case or controversy exists," stating:

"Although this may influence the size of the award, it does not preclude recovery. If the wrong complained of is a mere technical violation of the plaintiff's constitutional rights and she is unable to prove actual damage, she would nevertheless be entitled to a recovery of nominal damages. In the recent case of *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1054, 55 L.Ed.2d 252 (1978), the Supreme Court explained, in connection with a violation of the right to procedural due process, that, '[b]y making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed.' Certainly, the rights to freedom of expression and association are no less important to organized society than the right to procedural due process. The *Carey* decision also makes it clear that the plaintiff may recover for the mental and emotional distress actually caused by a violation of the plaintiff's civil rights. *Id.* at 264, 98 S.Ct. at 1052 & n.20; see *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997 [3012], 41 L.Ed.2d 789 (1974); *Curtis v. Loether*, 415 U.S. 189, 195–96 n.10, 94 S.Ct. 1005 [1008–09], 39 L.Ed.2d 260 (1974); *Fort v. White*, 530 F.2d 1113, 1116 (2d Cir. 1976); *Stolberg v. Members of the Board of Trustees*, 474 F.2d 485, 489 (2d Cir. 1973). The availability of either nominal or substantial damages is sufficient to prevent this case from becoming moot. See *Powell v. McCormack*, 395 U.S. 486, 495–500, 89 S.Ct. 1944 [1950–1952], 23 L.Ed.2d 491 (1969).

"Finally, we note that the defendants' allegedly wrongful conduct required the plaintiff to hire counsel to bring this action to prevent her eviction, and only after suit was brought did the defendants agree not to pursue the eviction proceedings. In these circumstances, the defendants' potential liability for attorney's fees under 42 U.S.C. § 1988 is an additional factor which prevents this case from becoming moot." 578 F.2d at 463–64.

See, in accord, *McCabe v. Nassau County Medical Center*, 453 F.2d 698 (2d Cir. 1971); *Mawhinney v. Henderson*, 542 F.2d 1 (2d Cir. 1976); *Jones-Bey v. Caso*, 535 F.2d 1360 (2d Cir. 1976). The very same reasons prevent the substance of this case from becoming moot.

Rule 5 clearly limited the tenants' freedom to associate and intruded on their privacy. The rule sought to require tenants to disclose to their landlord the identities of any individuals they wished to have as overnight guests, to have those guests approved under a hopelessly broad standard of "reasonableness" and to have the identities of their guests logged in their tenant files. The tenants had to undergo this for each friend or relative they wished to have stay or disregard the Rule and risk the loss of their lease. It would be ignoring the realities of human nature and relationships to conclude that the disclosure of this highly intimate information, coupled with the necessity of registration and advance approval, did not impinge on the tenants' freedom to have whomever they wanted visit their homes. The Authority's legitimate interests in "maintaining safe, decent housing and in keeping track of occupancy and eligibility in public housing," 497 F.Supp. at 1220, would justify the intrusion only upon a showing that the means adopted (i. e., old Rule 5) were the least restrictive in light of the interests served, *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Here the Authority failed to sustain that burden.

If the Authority's concern was that only authorized tenants *occupy* the apartments, it could by less intrusive means have required tenants to show that only proper individuals were living in the apartments

and to explain the extended presence of non-tenants. The Authority regularly took photos of the car licenses in the parking lots and its guards also reported unauthorized tenants. When suspicion of illegal occupancy arose, the Authority could then have employed the type of "reasonably narrow inquiries into personal information that is germane to the financial and administrative integrity" of the program, which the district court noted have been upheld in certain Aid to Families with Dependent Children cases. 497 F.Supp. at 1226.

Rule 5 was not a reasonably narrow subsequent inquiry. On the contrary, it required prior disclosure of *every* overnight visitor. Further, the requirement that the Authority approve of a particular night's visitor and know that person's name in no way served the interest of having only eligible tenants. Likewise, if overcrowding was a concern, the Authority could regulate the number of persons allowed to stay in any one apartment or the amount of water or electricity that might be used; or, if an "unhealthy" situation arose, the Authority could act to alleviate it. The registration of guests did not promote the health and sanitary conditions of the project.

Rule 5's demand for prior permission, disclosure of names, and approval, was thus an overbroad defense against remote dangers which could all have been combated in more direct and less intrusive ways. Additionally, the district court's notion that the reasonableness standard embodied in Rule 5 was not flawed by any improper "breadth or generality," 497 F.Supp. at 1223, is in our view erroneous. Rule 5 endowed the Authority's project manager with almost complete discretion. Finally, the voluntary rescission of Rule 5 indicates that it was not considered even by the Authority itself to be necessary to effectuate the legitimate state interests at stake. The Authority could have, as federal projects and other state projects do and as Peekskill itself will do in the future, maintained health, safety and legal occupancy without it.

Accordingly, the district court's decision that the governmental interests at stake

justified the intrusions of Rule 5 must be reversed. The case is remanded to the district court for the purpose of determining whether any damages other than nominal exist and, if so, whether they may be recovered in light of the qualified immunity doctrine. If no actual damages exist, the district court is directed to enter a judgment for nominal damages in favor of the plaintiffs, see *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), and to award such attorney's fees as are reasonable.